AO 106 (Rev. 04/10)  Application for a Search Warrant

EG

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*
The residence located at 1570 Duxberry Avenue Columbus, Ohio 43211, including curtilage, detached buildings, any person located therein who may possess any form of digital device, and any digital devices located therein/thereon

) ) ) ) ) )

Case No. 2:21-mj-47

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A INCORPORATED HEREIN BY REFERENCE

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B INCORPORATED HEREIN BY REFERENCE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 USC Secs. 1956, 1343, and 21 U.S.C. Sec. 841 | Money laundering, wire fraud, and distribution or possession with intent to distribute controlled substances |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Samuel Chappell, TFO ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-26-21

City and state: Columbus, Ohio

_____
*Judge's signature*

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**IN THE MATTER OF THE SEARCH OF:**
**The residence located at 1570 Duxberry**
**Avenue Columbus, Ohio 43211, including**
**curtilage, detached buildings, any person**
**located therein who may possess any form of**
**digital device, and any digital devices located**
**therein/thereon**

Case No. ___2:21-mj-47___

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Samuel Chappell**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 1570 Duxberry

Avenue Columbus, Ohio 43211, hereinafter "Premises," further described in Attachment A, for

the things described in Attachment B including a 2021White Chevrolet Tahoe OH license plate

HRJ6201 VIN 1GNSKNKD9MR137754.

2.      I am a Columbus, Ohio Division of Police (CPD) detective assigned as a Task

Force Officer (TFO) with the Alcohol, Tobacco, and Firearms Bureau (ATF). I have been

employed by the Columbus Division of Police since 2007.  My responsibilities as a Task Force

Officer include the investigation of violent criminal street gangs, narcotics and firearms traffickers,

money launderers, and firearms-related crimes. I have participated in the execution of search

warrants and arrests related to the above-referenced offenses.

3.     Through this investigation, I have discovered that Larry K. SMITH has a history of criminal activity related to drug trafficking and weapons offenses. More recent investigations and information, as detailed below, suggest that SMITH is now involved in additional criminal activity related to narcotics trafficking, money laundering and fraud.

4.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have not omitted any facts that would negate probable cause.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1031 Major fraud against the United States, 18 U.S.C. § 1956 (a)(1)(A)(i) Laundering of monetary instruments with the intent to promote the carrying on of the specified unlawful activity, 18 U.S.C. § 1956 (a)(1)(B)(i)Laundering of monetary instruments with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, and 21 U.S.C. § 841(a)(1) possession with intent to distribute a controlled substance have been committed by SMITH. There is also probable cause to search the Premises described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes, as further described in Attachment B.

## APPLICABLE STATUTES AND DEFINITIONS

6.     Title 18 United States Code Section 1031 makes it a federal crime for any person to knowingly execute, or attempt to execute, any scheme or artifice with the intent to defraud the

United States; or to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

7.     Title 18 United States Code Section 1956 makes it a federal crime for any person, knowing that property involved in a financial transaction represents proceeds of unlawful activity, to conduct or attempt to conduct that financial transaction involving the proceeds of the unlawful activity, either A) with the intent to promote or carry on the unlawful activity or intent to violate section 7201 or 7206 of the Internal Revenue Code; or B) knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity or to avoid a transaction reporting requirement under state or federal law.

8.     Title 21 United States Code Section 841 makes it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance.  Subsection (b) of this section makes cocaine, cocaine base, heroin, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, and any of their isomers controlled substances.  Title 21, United States Code, Section

846 makes it a crime for any person to attempt or conspire to commit any offense defined in Section 841.

9.     The term "computer"[1] is defined in Title 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

10.     The terms "records", documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (such as writings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (such as printing or typing) or electrical, electronic or magnetic form (such as any and all digital data files and printouts or readouts from any magnetic, electrical, or electronic storage device).

### BACKGROUND REGARDING ACTIVITIES OF DRUG TRAFFICKERS

11.     Your affiant has learned through training and experience the ways in which narcotics traffickers conduct their business, including methods of distributing narcotics, the use of home-based telephones and the use of cellular telephones, and the use of vehicles to facilitate their illegal activities. Your affiant's training and experience as a CPD detective and an ATF TFO form the basis of the opinions and conclusions set forth below.  Based on your affiant's training, experience, and the experience of other officers, detectives, and agents, your affiant is aware:

---

[1] The term "computer" is used throughout this affidavit to refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets.

a.  that narcotics traffickers often place assets in names other than their own and/or use fictitious identification to avoid detection of these assets by government agencies or local law enforcement;

b.  that even though these assets are in other persons' names the narcotics traffickers continue to exercise dominion and control;

c.  that narcotics traffickers must maintain and finance their ongoing narcotics activities, as well as for paying bills, acquiring assets, and making other purchases;

d.  that it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, bus tickets, rental car receipts, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, purchasing, processing, storage, sale and distribution of drugs, and the collection of its proceeds. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the narcotics traffickers have ready access to them;

e.  that it is common for narcotics traffickers to secrete contraband, proceeds of drug sales, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value; and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money made from engaging in narcotics trafficking activities in secure locations within their residences and/or other locations over which they maintain dominion and control, in order to have ready access to them;

f.  that it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotic proceeds, such as: currency, financial instruments, precious metals and gem stones, jewelry, books, records, invoices, receipts records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, loan records, money orders, bank drafts, cashier checks, bank checks, wire transfers, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences and/or other locations which they maintain dominion and control;

g.  that when drug traffickers amass a large amount of proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits;

h.  that to accomplish these goals, narcotics traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, Western Union and other wire transfer or Money Service Businesses sales agents, check cashing

5

services, real estate agents, securities brokers, accountants, attorneys, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

i.   that narcotics traffickers often utilize electronic equipment such as currency counting machines, telephone answering machines, telephone caller identification boxes, and cellular telephones in their drug activities;

j.   that drug traffickers often take or cause to be taken photographs/video tapes of themselves, their associates, their property, and their products. These traffickers usually maintain these photographs/video tapes in their residences and/or other locations in which they maintain dominion or control, including on electronic devices which are used to post such photographs/videos on social media or other websites or applications;

k.   that the sale of controlled dangerous substances, generates large quantities of United States currency (aka, street money);

l.   that is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

m.   that the Currency Transaction Report (CTR - IRS Form 4789), which is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

n.   that in order to evade the filing of a Currency Transaction Report (CTR), narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

o.   that narcotics traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their suppliers, customers, and other associates involved in their narcotics trafficking organization;

p.   that drug traffickers commonly have in their possession, that is on their person, at their residences and/or other locations over which they maintain dominion and control, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and

6

secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency; and

q.  that courts have recognized unexplained wealth is probative evidence of crimes, in particular, trafficking in narcotics.

## INVESTIGATION AND PROBABLE CAUSE

A.  *Larry SMITH's Criminal History*

12.  In 2009 SMITH was convicted of carrying a concealed weapon, robbery, and participating in a criminal gang in the Franklin County Court of Common Pleas, Columbus Ohio. In 2015 SMITH was convicted of possession with intent to distribute 28 grams or more of cocaine base in the United States District Court for the Southern Judicial District of Ohio.

B.  *Narcotics Trafficking*

13.  Investigators believe that SMITH primarily uses two locations to facilitate his narcotics trafficking. One of those locations is the "Premises" and the other is 1007 Bay Ridge Dr. Lewis Center, Ohio 43035.

14.  Since his release from incarceration, SMITH appears to have continued his involvement in trafficking illegal narcotics as evidenced by several contacts with law enforcement where controlled substances were recovered. Investigators believe SMITH to traffic in exotic marijuana, cocaine and fentanyl.

15.  On or about February 26, 2015 a uniformed CPD officer observed a white Dodge Challenger make a traffic violation. When the officer turned around and caught up to the Challenger he observed the vehicle parked but with the engine still running and SMITH walking away from it. After obtaining SMITH's information SMITH was arrested for driving without a

7

license. During a search incident to arrest a small baggie of marijuana was found as well as the keys to the Challenger. During an inventory search of the Challenger officers found a black bag on the passenger seat. The black bag contained multiple baggies, a scale, and baggies containing suspected narcotics. The suspected narcotics were sent to the Columbus Division of Police Laboratory where a drug identification was conducted. The lab determined that the bags contained approximately 80.7 grams of cocaine base.

16.     On July 17, 2019 a search warrant was executed at 1907 Solera Drive Apt B. Columbus Ohio 43229 by the Columbus Police Department. 1907 Solera Drive Apt B is the home of Markos Johnson. Inside the home at the time of the search warrant were Johnson, Larry SMITH, and Abdirashid Botan. During a search of the residence investigators recovered US Currency, several pounds of marijuana, jewelry, scales, narcotics packaging material, a baggie containing approx. 7 grams of fentanyl, a Glock 43 handgun, and ammunition. The baggie of fentanyl was located under SMITH's body.

17.     On or about March 4, 2020 SMITH was present at 858 Garden Terrace Rd. Columbus, Ohio when a search warrant relating to narcotics activity was executed by Columbus Police at this residence. Upon his arrival SMITH was observed by police officers carrying a backpack into the residence. After executing the search warrant, investigators found illegal narcotics in the residence, the backpack SMITH had been observed carrying into the residence, cellphones, and several people inside the home including SMITH.

18.     Officers recovered $10,000 in US Currency inside of the backpack. SMITH upon being read his rights stated he did arrive with a backpack. Larry SMITH stated the money was

8

his and he just received his income tax return in the amount of $8300. Illegal narcotics were

recovered pursuant to this search warrant. SMITH was also asked about being present in recent

narcotics raids and he stated the people he hangs out with are drug dealers.

19.     Additionally, Larry SMITH stated he is part of SNP (Short north Posse) and has

claimed this gang for years. SMITH stated he did not get involved with any of the acts the gang

was involved in but was just associated with the gang. SMITH did claim to be part of SNP and

did not try to disassociate himself with the gang.

20.     A search warrant was later executed on the cellphone belonging to SMITH which

was recovered on or about March 4, 2020. The phone number assigned to the phone recovered

from SMITH was found to be (614) 584-1513. Investigators found multiple text messages from

and to SMITH discussing the sale of illegal narcotics.  For example, on or about March 1, 2020

SMITH messages an unknown person "get it here with the small bags Nd I'll buy two". A  reply

message is sent stating "I didn't bring enough I got a pound of moon rock and runtz[2] pig[3]".

SMITH responds, "I only got like a band on my cash app bra but if you do get a chance to get it

I'll pay a lil extra".

21.     On or about February 25, 2020 SMITH send a message stating "bring that bread

and another pig".

_____

[2] Runtz is a type of high end marijuana.

[3] Investigators believe Pig to be slang for a pound

9

22.     A video found on SMITH's phone shows him counting money beside a bed. On the bed is what appears to be bags of illegal narcotics.

23.     On or about August 18, 2020 investigators were conducting surveillance at the Premises. During less than an hour span investigators observed three vehicles arrive at the Premises. The occupants entered the Premises and then left after a short period of time.

24.     On or about August 26, 2020 investigators were conducting surveillance at the Premises. During less than an hour span investigators observed three vehicles arrive at the Premises. The occupants entered the Premises and then left after a short period of time.

25.     On or about September 1, 2020 investigators were conducting surveillance at the Premises. During a 15 minute span investigators observed three vehicles arrive at the Premises. The occupants entered the Premises and then left after a short period of time.

26.     On or about December 3, 2020 investigators were conducting surveillance at the Premises. During an hour and a half span investigators observed three vehicles arrive at the Premises. The occupants entered the Premises and then left after a short period of time.

27.     The activity noted in paragraphs 23-26 is consistent with narcotics trafficking. Through training and experience investigators know that multiple different vehicles and occupants arriving and departing in a short period over a several day period is often indicative of narcotics transactions. Narcotics transactions are usually conducted discreetly and are over quickly. When narcotics traffickers are selling they often have their customers leave immediately after the sale so that transactions do not overlap.

10

28.     On or about December 1, 2020 during surveillance investigators observed SMITH leave 1007 Bay Ridge Dr. SMITH left in his white Chevrolet Tahoe. SMITH drove to a location in Columbus Ohio investigators believe to be used for narcotics trafficking. SMITH entered the location. While on surveillance investigators observed a person hereafter identified as Confidential Source 1 (CS1) exit the residence. A short time later SMITH exited the residence and went to the Premises. A traffic stop was conducted on CS1. During the stop investigators found marijuana, crack, and an unknown powdery substance. CS1 agreed to speak with investigators. CS1 described a male inside the location matching SMITH's description who he/she knows as "Black". CS1 stated that "Black" drives a new white Tahoe. CS1 stated that "Black" arrived at the location with approximately 4 ounces of fentanyl and several pounds of marijuana. CS1 stated that "Black" took some of the fentanyl and left the rest. CS1 stated that "Black" left the location right after he/she did.

29.     Investigators executed a search warrant on the Instagram page believed to belong to SMITH. SMITH has several conversations on Instagram related to narcotics trafficking. On or about October 3, 2020 SMITH is sent a message asking "how much for a zip[4]?"  SMITH's account replies "500". SMITH is then asked if he still has some and he replies "yea".

30.     On or about December 14, 2020 investigators observed SMITH sitting inside of his Chevrolet Tahoe while it was parked near 1935 Solera Dr. A male driving a Dodge Durango parked near SMITH and exited his Durango. The male then entered SMITH's Tahoe. A short

---

[4] An ounce of narcotics is commonly referred to as a "zip".

11

time later the male exited SMITH's vehicle and left driving the Durango. Investigators believing that they had observed a drug transaction had a traffic stop was conducted on the Durango. During a search of the Durango exotic marijuana was found.

C.  *Fraud Activities*

31.     During the course of this investigation Larry SMITH'S tax filing history was obtained from the Ohio Department of Taxation. The results of which showed Larry SMITH has not filed any personal income tax returns from 2015 to 2019 or any business tax returns from 2015 to 2020. Which is further evidence of Larry SMITH'S lack of gainful employment. Based upon your affiant's experience and training Larry SMITH'S lack of tax filing history combined with his known narcotics trafficking is consistent with individuals involved with illegal money laundering.

32.     On or about September 26, 2018 Larry SMITH filed Domestic for Profit LLC- Articles of Organization paperwork with the Ohio Secretary of State's office for a business he named Larry's Cleaning LLC. Your affiant is aware based upon other cases he has been involved with in the past that narcotics dealers will many times file business paper work forming a business in an attempt to legitimize their illegal income. Likewise as set forth in paragraph 31 they will report no income for tax purposes as it relates to this business entity.

33.     During the interview with police on March 4, 2020 SMITH provided the following information relating to Larry's Cleaning LLC. Larry SMITH stated he was self-employed and had his own cleaning company. SMITH stated he had a work van for the company but did not really know what kind of van it was. SMITH stated he cleaned a few companies and

12

named HILTI and ENCHANTED CARE in Powell as well as a trucking company but did not know the name of the trucking company. When asked about where the trucking company was located he was not able to tell officers where it was exactly but said it was on the west side of Columbus. Officers asked SMITH where he purchased his cleaning supplies and he stated that the companies he cleaned for provided the supplies for him. SMITH stated he made approximately $2000 per month from the cleaning company.

34.     SMITH stated he worked at Enchanted Care Monday through Friday each week and he was the one that cleaned the business and on occasion his sister would help him. On March 5, 2020 Columbus Police Officer Daugherty called the Enchanted Care in Powell and spoke with the manager there who stated they use Olympus cleaning company and Olympus uses their own cleaning supplies to clean the day care.

35.     On or about June 24, 2020 Larry SMITH purchased real property located at 1570 Duxberry Avenue Columbus, Ohio (Premises) for $15,000 (no mortgage noted).

36.     Larry SMITH maintained a saving and checking account at Education First Credit Union during 2019 and 2020. Investigators obtained SMITH's banking records from his account at Education First Credit Union. During 2019 and 2020 Larry SMITH's savings account reflected $1,326.32 in total deposits; $1,326 were cash deposits and the remaining thirty-two cents were interest deposits. During 2019 and 2020. Larry SMITH'S checking account reflected total deposits of $114,247.90. Of those deposits, $62,344.33 were ACH deposits, $4,940 were ATM; $25,162 were cash and various deposits.

13

37.     The total deposits to Larry SMITH's Education First Credit Union accounts totaled: $115,574.22. SMITH's deposits are not consistent with legitimate income as reflected by his lack of any Ohio State tax filing history.

38.     On or about July 13, 2020 Larry SMITH filed a loan application with the United States Small Business Administration (SBA) seeking a $45,000 loan under their Economic Injury Disaster Loans Program (EIDL). The **EIDL** program is designed to provide economic relief to businesses that are currently experiencing a temporary loss of revenue due to coronavirus. (COVID-19)  SMITH on his loan application listed his previous 12 month gross revenues as $100,000 for his business Larry's Cleaning Company.  He also listed that Larry's Cleaning Company had a total of twelve employees. This loan was approved by the SBA based upon information provided by SMITH that the SBA believed to be accurate. On or about August 4. 2020 the SBA made an ACH deposit to SMITH's Education First Credit Union account # 1170000056675 in the amount of $44,900.  The $100 difference between the loan and disbursement amount being an administrative fee.  You affiant during the course of the investigation determined SMITH filed no tax returns for Larry's Cleaning Company therefore reporting no income. An analysis of SMITH's known bank accounts reflected no activity consistent with wage payments to employees either before or after the SBA loan was distributed. Also based upon SMITH's previous false statement to police relating to Larry's Cleaning Company your affiant believes probable cause exists that this is a business in name only utilized by SMITH to justify his illegal source of income.

14

39.     Records from 7th Gear Exotics which is an exotic car rental business located in Groveport, Ohio show that SMITH or a woman who identified as his girlfriend have rented several vehicles between August 2020 and October 2020.

40.     On or about October 3, 2020 SMITH rented a 2020 Dodge Charger Hellcat for $400.00 a day with a deposit of $900.00. The vehicle was rented until October 5, 2020.

41.     On or about July 31, 2020 a 2019 Lamborghini Urus was rented by Marshae Love for SMITH at the rate of $1700.00 per day with a deposit of $2,000. The vehicle was rented until August 3, 2020. When the vehicle was returned by SMITH it was found to have damage from bullets. The preliminary estimate to repair the vehicle was $103,355.88.



Photo of damage to driver's door of Lamborghini Urus

15

42.    The following photographs were posted to a public social media account investigators believe is maintained by Larry SMITH. Several photos show SMITH with large amounts of cash in his possession:



Posted September 30, 2020



Posted September 15, 2020

16



Post January 10, 2021. Investigators believe this photo was taken inside of the Premises.



17

43.     Currently the Premises is listed for sale online. Investigators believe that the above photo listed online as a photo of 1570 Duxberry Ave is taken in the same location as the prior photo of SMITH with a large sum of US Currency.

44.     On or about November 16, 2020 SMITH purchased a white 2021 Chevrolet Tahoe from Mark Wahlberg Chevrolet for a total price of $66303.23. SMITH traded in his 2019 Dodge Challenger and put $12,500.00 down towards the purchase of the Tahoe. SMITH financed $32,803.23 for the subject vehicle. SMITH has a monthly payment of $655.66.

45.     On or about November 16, 2020 on a loan application for the Chevrolet Tahoe SMITH stated that his total monthly income was $4,500.00. SMITH stated that he was the owner/president of Larry's cleaning Co. LLC.

46.     On or about December 15, 2020 SMITH purchased a plane ticket from Columbus, Ohio to Atlanta, Georgia. The ticket had been purchased approximately 24 hours prior. During a consensual encounter at the airport Investigators spoke with SMITH. During the encounter investigators smelled a strong odor of marijuana. SMITH stated he had just smoked marijuana. When asked SMITH stated that he did not have large amounts of money. During a search of SMITH's luggage investigators located what they estimated to be $10,000.00 in US Currency. SMITH stated that he did not consider $10,000.00 to be a large amount of money. Further he stated that he owns a cleaning business and that he paid taxes last year.

C.      *SMITH's links to 1570 Duxberry Ave*

47.     As detailed in paragraph 35 SMITH purchased the Premises on or about June 2020.

18

48.     On or about November 19 and 20th, 2020 investigators observed SMITH's Chevrolet Tahoe parked at the Premises.

49.     On or about November, 25, 2020 investigators once again observed SMITH's Chevrolet Tahoe parked at the Premises. Investigators observed SMITH exit the premises and drive to 1007 Bay Ridge Drive.

50.     On or about November, 27, 2020 investigators again observed the SMITH's Chevrolet Tahoe parked at the Premises.

51.     On or about December 28, 2020 investigators observed SMITH arriving at the premises driving the Chevrolet Tahoe. SMITH enters the premises.

52.     Between January 1, 2021 and January 20, 2021 electronic surveillance showed SMITH's vehicle in the vicinity of the premises on 40 occasions.

## TECHNICAL TERMS

53.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

19

    b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    c.  Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

54.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

55.    *Probable cause.* I submit that if a computer or storage medium is found on the Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file

20

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

56.     Based on actual inspection of other evidence related to this investigation, such as records from the Small Business Administration I am aware that computer equipment was used to generate, store, and or print documents used in the fraud scheme. Similarly, your affiant is aware that SMITH utilized cellular phones to communicate with customers who purchased

21

narcotics from him. As such, there is reason to believe that there are computer system(s) and/or other digital devices currently located on the Premises

57.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the

22

innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant

23

insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

58. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a Premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the Premises, it is sometimes possible to make

24

an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on Premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

25

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

60. I submit that this affidavit supports probable cause for a warrant to search the Premises described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Samuel Chappell
Task Force Officer, ATF

Subscribed and sworn to before me this 2 day of January, 2021.

UNITED STATES MAGISTRATE JUDGE

26

## ATTACHMENT A
*Property to be searched*

The place to be searched is the residence described below, including all its appurtenances, parking areas, outdoor working areas, detached buildings, individuals at the residence who may be in possession of a mobile computing device, and any computing related devices or digital media located therein or thereon.

The residence located at 1570 Duxberry Ave. Columbus Ohio, 43211is a single story, single family home with light blue colored siding. The front door has a concrete steps leading up to a concrete porch with a wooden railing. A photo of the home is attached.



## ATTACHMENT B
*Property to be seized*

1.      All records relating to violations of 18 U.S.C. § 1031. Major fraud against the United States 18 U.S.C. § 1956 (a)(1)(A)(i) (Laundering of monetary instruments with the intent to promote the carrying on of the specified unlawful activity) 18 U.S.C. § 1956 (a)(1)(B)(i)(Laundering of monetary instruments with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance) those violations involving Larry SMITH, including:

      a.  Records relating to Larry's Cleaning LLC;

      b.  Records relating to the Small Business Administration's EIDL loan to Larry's Cleaning LLC:

      c.  Books, records, notes, ledgers, and other papers relating to the transportation, purchase, distribution, packaging, and sale of controlled substances which may be maintained in either paper form or on computers;

      d.  Cash, currency, jewelry, currency counters, financial instruments, and records relating to controlled substances, expenditure of proceeds of drug transactions, fraud, ,and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking;

      e.  2021 White Chevrolet Tahoe license plate HRJ6201 VIN 1GNSKNKD9MR137754

f. Bank and other financial institution records consisting of savings, loans, records of deposits, statements, letters of credit, money orders, cashier checks, passbooks, cancelled checks, certificates of deposit, lease agreements, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, information related to the receipt and other disposition of income, and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, automobiles, jewelry, and furniture;

g. Proof of residency, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys;

h. Safe deposit box lease agreements and safe deposit keys;

i. Any safes, vaults, or secured storage equipment that could secret any of the above listed items, and the contents therein. With the ability to open by force if necessary;

2. Firearms, firearm parts, and accessories.

3. Illicit narcotics and narcotics trafficking paraphernalia to include scales, blenders, and narcotics packaging material.

4. Computers or storage media used as a means to commit the violations described above.

2

5.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

3

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.